DECISION
{¶ 1} Relator, David E. Hina, filed this action in mandamus seeking a writ to compel the Industrial Commission of Ohio ("commission") to vacate its order denying him an award for an alleged violation of a specific safety requirement ("VSSR") from Anchor *Page 2 
Glass Container Corporation ("Anchor Glass"). Relator requests that the writ also compel the commission to grant him an award for VSSR.
 {¶ 2} In accord with Loc.R. 12, the case was referred to a magistrate to conduct appropriate proceedings. The parties stipulated to pertinent evidence and filed briefs. The magistrate then issued a magistrate's decision which contains detailed findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate's decision includes a recommendation that we deny the request for a writ of mandamus.
 {¶ 3} Counsel for relator has filed objections to the magistrate's decision. Counsel for Anchor Glass and counsel for the commission have each filed a memorandum in response. Counsel for relator has also filed a notice of filing of supplemental authority. The case is now before the court for review.
 {¶ 4} Relator had his hand caught in the cutters of a milling machine, resulting in significant injuries. He filed an application for a VSSR award based upon an allegation of failure of Anchor Glass to provide a means for disengaging the machine from its power supply and a failure to provide a device to lock the controls of the machine in the off position when the machine was shut down.
 {¶ 5} A hearing was heard before a staff hearing officer ("SHO") of the commission, who found no VSSR. The SHO found the milling device had no knives, so no violation of Ohio Adm. Code 4121:1-5-11(D)(13) occurred. The SHO found no violation of Ohio Adm. Code 4121:1-5-05(D)(2) because of Anchor Glass's "lock-out/tag-out" procedure.
 {¶ 6} In a detailed analysis, the SHO found no violation of Ohio Adm. Code 4121:1-5-05(D)(1), despite finding the power switch to be inaccessible to the operator. *Page 3 
The SHO reasoned that a lever which acted to engage or disengage the moving parts of the milling machine could be considered as a switch to disengage the machine from its power supply, even though it did not disrupt the flow of electricity into the milling machine. There also was testimony before the SHO that the lever which engaged or disengaged the moving parts would be held in position by large rubber bands by workers with Anchor Glass because of difficulties in performing the expected tasks.
 {¶ 7} In the objections filed on behalf of relator, counsel for relator questions the distinction drawn between the cutting heads which gouge out a cut and cutting blades. Counsel also questions the interpretation of the SHO and the magistrate with respect to a cut-off switch.
 {¶ 8} As to the cutting head in the milling machine, the SHO was within the range of discretion to find that the milling machine did not house power driven knives or cutting blades. Therefore, Ohio Adm. Code4121:1-5-11(D)(13) was not violated. This objection is overruled.
 {¶ 9} The provision of Ohio Adm. Code 4121:1-5-05(D)(1) states:
 (D) Machinery control.
 (1) Disengaging from power supply.
 Means shall be provided at each machine, within easy reach of the operator, for disengaging it from its power supply. This shall not apply to rolling departments of iron and steel mills nor to electrical power generation or conversion equipment.
 {¶ 10} The evidence before the commission clearly establishes that the milling machine had no means within easy access of the operator for disengaging the machine from its power supply. The attempt to equate a lever which moved the moving milling *Page 4 
parts from one place to another with a switch or other device to immediately cut off the power to the machine is an attempt to avoid the obvious. The machine simply did not comply with Ohio Adm. Code4121:1-5-05(D)(1).
 {¶ 11} Relator had his arm drawn into the milling machine. He could not hit a cutoff switch because there was no cut-off switch accessible. The VSSR was clearly established unless the honorable court engages in a tortuous interpretation of what a power supply is. We are not willing to do so. We sustain this objection. We adopt the findings of fact and the conclusions of law contained in the magistrate's decision except with respect to Ohio Adm. Code 4121:1-5-05(D)(1).
 {¶ 12} As a result, we grant the requested writ of mandamus in part. The finding of the commission that no VSSR occurred is ordered to be vacated. The commission shall enter an order finding the existence of a VSSR based upon a violation of Ohio Adm. Code 4121:1-5-05(D)(1) and assess an appropriate award for the VSSR, following a determination of whether or not the VSSR was a direct and proximate cause of Mr. Hine's injuries.
Objections sustained in part; writ of mandamus granted in part.
 KLATT and FRENCH, JJ., concur. *Page 5 
 APPENDIX A IN MANDAMUS {¶ 13} Relator, David E. Hina, has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying his application for an additional award for respondent Anchor Glass Container Corporation's ("employer") violation of a specific *Page 6 
safety requirement ("VSSR"), and ordering the commission to issue an order granting the requested VSSR award.
Findings of Fact: {¶ 14} 1. Relator sustained a work-related injury on November 5, 2003, when his left hand was caught in the cutters of a milling machine. Relator sustained significant injuries which are not at issue in this case.
 {¶ 15} 2. On April 18, 2005, relator filed an application seeking an additional award for a VSSR alleging that his employer violated the following Ohio Adm. Code provisions: 4121:1-5-11 (D)(13) and 4121:1-5-05(D)(1) and (2). Relator argued that the employer was required to guard the machine in question, did not provide the proper means for disengaging the machine from its power supply, and failed to provide a device to lock the controls of the machine in the off position when it was shut down.
 {¶ 16} 3. Relator's application was heard before a staff hearing officer ("SHO") on March 16, 2006, and resulted in an order denying the request for an additional award for a VSSR. First, the SHO found that there was no violation of Ohio Adm. Code 4121:1-5-11(D)(13), which provides:
 (D) Other power machines and machine tools.
 * * *
 (13) Knives.
 All power driven knives or cutting blades, such as reciprocating knives, endless band knives, flying knives, slicer blades, and similar cutting machines, where exposed to contact, shall be guarded except for the necessary working portion of the blade while being used.
 Exception. *Page 7 
 Machinery covered expressly by requirements contained in other codes of specific requirements of the industrial commission of Ohio.
 {¶ 17} 4. The SHO provided the following reasoning:
 The Cincinnati Horizontal Milling Machine in question does not perform its function with "knives", "cutting blades", "reciprocating knives", "endless band knives", "flying knives", "slicer blades", or some device "similar". The claimant/injured worker brought to hearing two (2) of the cutter items. They are more properly cutter wheels or cutter heads. They can be safely picked up with one's hands. There is not a blade or knife aspect to the items. The employer's expert witness, Mr. Vaughan, testified to what the cutting items were called in this industry. He stated they could be termed cutter heads or milling heads. The Hearing Officer relies on his testimony in this aspect. There are photographs that show the items in question. These are photographs numbers 4 and number 5. Visually these items confirm Mr. Vaughan's testimony that these items are not knives or blades.
 {¶ 18} 5. Thereafter, the SHO found that there was no violation of Ohio Adm. Code 4121:1-5-05(D)(2), which provides:
 (D) Machinery control.
 * * *
 (2) When machines are shut down.
 The employer shall furnish and the employees shall use a device to lock the controls in the "off" position or the employer shall furnish and the employees shall use warning tags when machines are shut down for repair, adjusting, or cleaning.
 {¶ 19} 6. The SHO reasoned as follows:
 The employer has submitted a large amount of evidence as to its "lock-out/tag-out" procedure. This includes instructions, training sessions, and work signatures of employees. The compliance of the employer with this subsection has not been challenged with any evidence. *Page 8 
 {¶ 20} 7. The majority of the SHO's order focused on relator's application concerning a violation of Ohio Adm. Code 4121:1-5-05(D)(1), which provides:
 (D) Machinery control.
 Disengaging from power supply.
 Means shall be provided at each machine, within easy reach of the operator, for disengaging it from its power supply. This shall not apply to rolling departments of iron and steel mills nor to electrical power generation or conversion equipment.
 {¶ 21} 8. In resolving this issue, the SHO acknowledged that the machine was equipped with a power switch which controlled electricity to the entire machine. This switch was located on the opposite side of the operator. The SHO determined that this power switch did not meet the requirements of the above subsection because it was not within easy reach of the operator. However, the SHO noted that the machine was equipped with a lever on the side where the operator stood which acted to engage and disengage the moving parts of the machine. The SHO explained:
 * * * [A] handle or lever on the side where the operator would stand, started and stopped the moving parts of the machine. The cutter heads attached to a spindle. The spindle and the heads were motionless until the operator pulled the lever forward. The handle or lever controlled the spinning of the spindle and, thus, the cutter heads. When pulled back, the action of the machine stopped. If the lever qualifies as an acceptable means of "disengaging it from its power supply" is a central question here.
 {¶ 22} 9. After considering the evidence, the SHO ultimately concluded that this lever qualified as a control that could disengage the machine from its power supply.
 {¶ 23} 10. Various employees testified at the hearing concerning the use of the machine at issue. It was explained that the milling machine was used to make cuts, or *Page 9 
grooves, in molds. Before a cut could be made, the operator needed to set the proper speed. Testimony indicated that the machine was equipped with a dial which set the speed of the spindle. However, testimony indicated that the dial was not necessarily accurate, and that the operators needed to visually observe the speed of the spindle while adjusting the speed on the dial. As such, the operator would use the lever to engage the spindle so that it was spinning at the same time the operator used the dial to set the speed (both hands would be occupied). Thereafter, the operator would place a mold into the device and prepare to make the cuts. The lever was pulled to one side to engage the cutter heads and begin the spinning; the mold was positioned where the cutter heads could make the cut; once the cuts had been made, the lever was moved in the opposite direction to disengage the cutter heads from spinning. There was also testimony that, when making heavy cuts, the lever would vibrate. When this happened, the cutter heads were affected, the speed changed, and the cutter heads could break. As such, operators routinely used heavy duty rubber bands to secure the lever in place when making heavy cuts.
 {¶ 24} 11. Because the lever both engaged and disengaged the spinning of the spindle and the cutter heads, and the lever was on the same side as the operator, the SHO concluded that the lever satisfied the requirements of Ohio Adm. Code 4121:1-5-01(D)(1).
 {¶ 25} 12. Much of the testimony involved the use of the heavy duty rubber bands to hold the lever in place while heavy cuts were being made. The SHO found that the employer acknowledged the use of the banding devices and, as a result, when the rubber bands were being used, there was no effective, non-impaired means of *Page 10 
disengaging the action of the machine within easy reach of the operator. As such, the SHO found that when heavy cuts were being made, Ohio Adm. Code 4121:1-5-05(D)(1) was being violated. However, the SHO found that relator's injuries did not occur when a heavy cut was being made.
 {¶ 26} 13. The SHO acknowledged that part of the difficulty at the hearing was occasioned by the fact that there were no eye witnesses to the accident and relator admitted that he really could not remember exactly what he was doing or explain how the accident happened. In this regard, the SHO stated as follows:
 There was no part in the machine when the injury occurred. So, the injury did not occur during the actual cutting phase of the operation of the machine. If a part was in the machine much of the action of the cutter heads would be blocked by the part or blank. However, even with a part, blank, or mold, in the machine there was still, it is found, a risk of injury. The risk would be reduced, but a risk of injury would still be present. However, it would, most likely, not be the type of injury that occurred here with the cutter heads acting to pull the injured worker's arm into the machine. The point is, somewhat, academic because the injury here occurred without a part in the machine.
 The injured worker was, apparently, at some set-up phase of the operation when he was injured. So, there is the question of whether the power shut-off lever was impaired at the phase of the operation at which the injured worker's arm was caught in the machine. It has not been shown that the power engagement arm and disengagement arm was impaired when the accident occurred. Even from the injured worker's testimony the status of the power engagement/disengagement arm cannot be determined. The injured worker testified that he would shut the cutters off before loading a part. If he was at the phase of still setting the speed dial, and was in the process of attaching the banding device it would make some sense of the situation. However, it is not clear, if while doing this, whether the power arm or lever had the banding device attached. There is no evidence in the investigation report nor from any witness, including the claimant's witnesses, that the *Page 11 
banding device was holding the power engagement arm or lever when the injured worker's arm was removed from the machine. It has not been shown, therefore, that the power engagement lever was not fully functional to shut the cutter heads off when the accident occurred. Thus, even though it cannot be condoned to use rubber bands to form a device to operate this machine, and even though the use of the banding device impaired the means of disengaging the power to the cutter heads at one phase of the operation of this machine, contra to OAC 4121:1-5-05(D)(1), the use of the banding device was not, or has not been shown, to be the proximate cause of the accident. Therefore, the IC-8 application is denied.
 {¶ 27} 14. Relator filed a motion for reconsideration including an affidavit prepared by relator. That motion was denied.
 {¶ 28} 15. Thereafter, relator filed the instant mandamus action in this court.
Conclusions of Law: {¶ 29} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. State ex rel. Pressley v. Indus. Comm.
(1967), 11 Ohio St.2d 141. A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. State ex rel. Elliott v. Indus. Comm. (1986), 26 Ohio St.3d 76. On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. State ex rel. Lewis v. Diamond FoundryCo. (1987), 29 Ohio St.3d 56. Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. State ex rel. Teece v. Indus. Comm. (1981),68 Ohio St.2d 165. *Page 12 
 {¶ 30} In regard to an application for an additional award for a VSSR, the claimant must establish that an applicable and specific safety requirement exists which was in effect at the time of the injury, that the employer failed to comply with the requirement, and that the failure to comply was the proximate cause of the injury in question. State exrel. Trydle v. Indus. Comm. (1972), 32 Ohio St.2d 257. The interpretation of a specific safety requirement is within the final jurisdiction of the commission. State ex rel. Berry v. Indus. Comm.
(1983), 4 Ohio St.3d 193. Because a VSSR award is a penalty, however, it must be strictly construed and all reasonable doubts concerning the interpretation of the safety requirement are to be construed against its applicability to the employer. State ex rel. Burton v. Indus. Comm.
(1989), 46 Ohio St.3d 170. The question of whether an injury was caused by the employer's failure to satisfy a specific safety requirement is a question of fact to be decided by the commission subject only to the abuse of discretion test. Trydle; State ex rel. A-F Industries v. Indus.Comm. (1986), 26 Ohio St.3d 136; and State ex rel. Ish v. Indus.Comm. (1985), 19 Ohio St.3d 28.
 {¶ 31} For the reasons that follow, it is this magistrate's conclusion that relator has not demonstrated that the commission abused its discretion in denying his application for an additional award for a VSSR.
 {¶ 32} Relator has asserted a violation of Ohio Adm. Code4121:1-5-11(D)(13), which provides:
 (D) Other power machines and machine tools.
 * * *
 (13) Knives. *Page 13 
 All power driven knives or cutting blades, such as reciprocating knives, endless band knives, flying knives, slicer blades, and similar cutting machines, where exposed to contact, shall be guarded except for the necessary working portion of the blade while being used.
 Exception.
 Machinery covered expressly by requirements contained in other codes of specific requirements of the industrial commission of Ohio.
 {¶ 33} The SHO determined that the cutter heads did not fall under the definition provided above. In making that finding, the SHO relied upon the testimony of Mr. Vaughan, the employer's expert witness, who testified that the cutter heads were not knives. The SHO also had the opportunity to personally view and handle the cutter heads. Based upon the testimony and the opportunity to actually view and handle the cutter heads, the SHO concluded that they did not fall under the above definition. The SHO also relied upon photographs numbers four and five, which are at pages 360 and 361 of the stipulated evidence[1]. The magistrate also notes that photograph 16, at page 366, shows the type of cuts which are made in the molds. In essence, the cutting heads gouge grooves into a mold. Those groves were cut to provide air to circulate while the mold was in use in whatever machine it was designed for.
 {¶ 34} Whether or not the cutter heads fall under the definition provided in Ohio Adm. Code 4121:1-5-11 (D)(13), is a question of fact. The SHO was able to personally view and handle the cutter heads, saw a picture of the type of cut the cutter heads made in molds, and heard testimony. Although relator contends that the cutter heads *Page 14 
fall under the portion of "similar cutting machines," the magistrate notes that the cutter heads do not make cuts similar to a knife. Instead, the cutter heads gouge out material. This magistrate cannot say that the commission abused its discretion in finding that the cutter heads did not fall under the definition provided in Ohio Adm. Code4121:1-5-11(D)(13).
 {¶ 35} Next, the SHO found that relator did not establish a violation of Ohio Adm. Code 4121:1-5-05(D)(2), which provides:
 (D) Machinery control.
 * * *
 (2) When machines are shut down.
 The employer shall furnish and the employees shall use a device to lock the controls in the "off" position or the employer shall furnish and the employees shall use warning tags when machines are shut down for repair, adjusting, or cleaning.
 {¶ 36} In this mandamus action, relator does not make an argument that the commission abused its discretion in this regard. After reviewing the stipulation of evidence, the magistrate finds that there was no evidence presented that the machine was shut down for repair, adjusting, or cleaning. Instead, the evidence showed that the machine was turned on and relator was making necessary adjustments in preparation of making a cut on specific molds. As such, the magistrate finds that the commission did not abuse its discretion in finding that Ohio Adm. Code4121:1-5-05(D)(2) was not violated. *Page 15 
 {¶ 37} The SHO also found that relator did not establish a violation of Ohio Adm. Code 4121:1-5-05(D)(1), which provides:
 (D) Machinery control.
 Disengaging from power supply.
 Means shall be provided at each machine, within easy reach of the operator, for disengaging it from its power supply. This shall not apply to rolling departments of iron and steel mills nor to electrical power generation or conversion equipment.
 {¶ 38} In this regard, the SHO essentially made three relevant findings: (1) the switch on the machine which controlled the electricity for the entire machine was on the opposite side of the operator and did not meet the requirements of the subsection because it was not within easy reach of the operator; (2) when the operator was utilizing rubber bands to secure the spindle lever, the spindle lever was not able to provide the operator with a means of disengaging the spindle and cutter heads from its power supply and, when the rubber bands were being used, there was no effective, non-impaired means of disengaging the action of the machine within easy reach of the operator; and (3) when rubber bands were not being used to hold the spindle lever in place, the spindle lever provided an acceptable means of disengaging the machine from its power supply.
 {¶ 39} In this mandamus action, relator does not challenge the first two findings. However, relator does challenge the commission's finding that when rubber bands were not being used, the spindle lever, in and of itself, provided the operator with an acceptable means of disengaging the machine from its power supply. In arguing that the commission abused its discretion in this regard, relator argues that the spindle lever *Page 16 
cannot constitute an acceptable means of disengaging the machine from its power supply because moving the spindle lever to the off position did not instantaneously stop the cutter heads from spinning. Instead, the spindle lever was described as being similar to a clutch in a manual transmission car. Putting the lever in the off position essentially put the spindle and cutter heads in neutral. The cutter heads were no longer being turned by a power source; instead, they slowed down and eventually stopped. Relator contends that compliance can only be accomplished if the spindle lever would have immediately stopped the cutter heads from spinning.
 {¶ 40} As noted previously, the testimony and other evidence presented indicates that when the spindle lever was moved from the on to off position, power to the spindle and cutter heads was cut off. As such, whatever gears caused the spindle to turn, those gears were disengaged and no longer kept the spindle and cutter heads turning. Once the power to the spindle was cut off and the gears were no longer causing the spindle and cutter heads to spin, the spindle and cutter heads slowed down until they stopped. None of the witnesses were able to provide any evidence concerning the length of time it took the spindle and cutter heads to stop spinning and no evidence was presented to describe how much faster the spindle and cutter heads would stop spinning once the gears were disengaged if there was an object, in this case relator's hand, in the way.
 {¶ 41} In reviewing the stipulation of evidence, the magistrate notes that an operator instruction book for this particular machine is provided in the evidence (pages 283 through 349). The section related to machine controls and operating instructions begins at page 305. At page 307, the manual provides as follows: *Page 17 
 Starting the Spindle. Start the machine. Move the directional control lever to either "right" or "left" position. Move the spindle starting lever all the way to the right. A quick acting brake will stop all moving units when the spindle starting lever is moved all the way to the left.
 {¶ 42} This paragraph, coupled with the testimony, indicates that the spindle and cutter heads slow down and stop relatively quickly. As such, the question becomes: does Ohio Adm. Code 4121:1-5-05(D)(1) require that the machine stop instantaneously when the machine is disengaged from the power supply? Common sense and experience indicate that this is not the case. Power tools which have spinning parts stop by slowing down. When turned off, the rotation does not stop instantaneously; instead, the rotating part slows down until it stops. Further, nothing in the code provision provides that the machine must instantaneously stop and the magistrate finds that to read such a requirement into the code would add a requirement which is not there. To do so would be improper. Further, relator presented no evidence that would show that, if he was able to push the power switch, the machine would have stopped rotating immediately. Therefore, relator could not show that moving the spindle lever to the off position acted any differently than the act of pushing the power switch. The reason these safety requirements are in the code is to lessen the impact of the accident on the employee. It is understood that, if an employee needs to hit the power switch to shut off the machine, the employee is already being injured. As such, a switch which disengages the machine from power acts to minimize the damage to the employee whereas a guard acts to stop an injury from even happening. The SHO relied on evidence showing that the spindle lever acted in this manner. *Page 18 
 {¶ 43} Furthermore, the SHO specifically noted that it was impossible to determine exactly what happened. Although relator indicated that he was at that point of set-up where it was time to attach the rubber band, relator did not testify that he was actually attaching the band or the band was in place. Further, relator did not establish that the action of the spindle lever was compromised in any way. As such, if this was the case, relator should have been able to disengage the spindle by moving the spindle lever. In this regard, the SHO found the use of the banding device was not shown to be the proximate cause of relator's injury. Because relator was not able to demonstrate that the spindle lever was in any way compromised, and because the commission found that the spindle lever was an alternative means of complying with Ohio Adm. Code4121:1-5-05(D)(1), the commission found that relator did not establish a VSSR. After reviewing the entire record in this case, this magistrate cannot say that the commission abused its discretion in this regard.
 {¶ 44} Based on the foregoing, it is this magistrate's conclusion that relator has not demonstrated that the commission abused its discretion in denying his application for an additional award for the employer's violation of a specific safety requirement and this court should deny relator's request for a writ of mandamus.
[1] Pages 359-366 showing photographs of various parts of the machine are out of order in the stipulation of evidence. They are located between pages 243 and 244 in the stipulation of evidence. *Page 1