THE STATE EX REL. HINA, APPELLEE, *v.* INDUSTRIAL COMMISSION OF OHIO ET AL., APPELLANTS.

[Cite as *State ex rel. Hina v. Indus. Comm.,* 121 Ohio St.3d 4, 2009-Ohio-250.]

(No. 2007–1984—Submitted November 18, 2008—Decided January 28, 2009.)

––––––––––––

**Per Curiam.**

{¶ 1} Appellee, David E. Hina, was injured by one of appellant Anchor Glass Container Corporation's ("Anchor's") milling machines, the Cinova 80. He has alleged that his injury is a result of Anchor's violation of a specific safety requirement ("VSSR"). Appellant Industrial Commission of Ohio determined that the Cinova 80 satisfied the applicable specific safety requirements. The

Court of Appeals for Franklin County, however, ruled that the machine did not satisfy former Ohio Adm.Code 4121:1–5–05(D)(1) and ordered the commission to determine whether the deficiency proximately caused Hina's injury. Both Anchor and the commission contest that decision.

{¶ 2} In 1988, Anchor installed the Cinova 80, a horizontal milling machine, at its Zanesville facility. Manufactured in 1967, the machine cut grooves into metal molds that were then used to form glass containers. Cuts were made by cutter heads—essentially mini saw blades—attached to a rotating spindle with a range of 25 to 2,000 r.p.m. An operator would start and stop the spindle by means of a lever. The spindle-starting lever, approximately three feet long, was located at chest level of an employee of average height.

{¶ 3} The lever on this Cinova 80 was not the original lever but a replacement, substantially longer than the original. This lever moved horizontally, left to right. In the off position, the lever was perpendicular to the machine. Moving the lever to the right activated the spindle. When in the on position, the lever was nearly flush against the machine.

{¶ 4} Functionally, the lever acted "[s]ort of like a clutch bringing your manual clutch out of gear," according to safety expert James E. Vaughan. The lever was not to be confused with the shutoff switch, which stopped power to the entire machine. The Cinova 80 had a switch on the opposite end of the machine, inaccessible from the location of the spindle-starting lever. There is no evidence that moving the spindle-starting lever to the off position stopped the cutter heads instantaneously, nor any evidence that the shutoff switch did either. The machine's operating manual indicated that when the spindle-starting lever is moved to the off position, "[a] quick acting brake will stop all moving units." Consistent with this description, James Vaughan had this exchange with Hina's counsel:

{¶ 5} "Q: When you push the arm back, what it does is decrease the power to the cutting blade to the point that it eventually cuts off power? Does it stop it dead in its tracks?

{¶ 6} "A: I think it would idol [sic], unless it's actually in the process of doing a cut, which the friction would bring it almost dead in its action.

{¶ 7} "Q: So if the blades are spinning, not a cut and you push back the lever arm, they would eventually coast to a stop?

{¶ 8} "A: Well, that—not really coast, but it would—it would sort of quickly come to a stop. It wouldn't like freewheel for a minute."

{¶ 9} Before using the machine, the operator had to set the spindle speed by using a dial. The appropriate spindle speed varied, depending on the number of cutter heads used and the type of metal to be cut. The spindle-speed dial was

immovable without the machine's power being on, but the dial could also not be moved while the spindle was moving. The speed indicated by the spindle-speed dial was not always accurate, so the operator had to move the dial and then start the spindle, to check if the speed was right. If the speed was not right, the operator would stop the spindle, move the dial, and check the speed again by starting the spindle.

{¶ 10} By 2003, the Cinova 80 was largely unused, being pressed into service only when there was a rush order. Anchor had such an order on November 5, 2003, and assigned Hina, one of its most experienced operators, to this machine. How the accident happened is unknown, since no one witnessed the initial contact and Hina remembers little. There was no mold in the machine at the time, so Hina was apparently in the set-up stage when the accident occurred. All Hina recalls is his left hand being pulled into the spindle and the cutting heads. Witnesses testified that Hina was flush against the machine, with his body against the spindle-starting lever, holding it in the on position. Co-workers stopped the machine by hitting the shutoff switch.

{¶ 11} Hina was severely injured, and a workers' compensation claim was allowed. He applied for an additional award, claiming that Anchor had violated, among other things, former Ohio Adm.Code 4121:1–5–05(D)(1), which provided:

{¶ 12} "(D) Machinery control.

{¶ 13} "(1) Disengaging from power supply.

{¶ 14} "Means shall be provided at each machine, within easy reach of the operator, for disengaging it from its power supply."[1]

{¶ 15} A commission staff hearing officer found no violation. He defined the issue as whether "the lever qualifies as an acceptable means of 'disengaging [the machine] from its power supply,'" and answered affirmatively. A motion for rehearing was denied.

{¶ 16} Hina filed a complaint in mandamus in the Court of Appeals for Franklin County. That court found a violation of former Ohio Adm.Code 4121:1–5–05(D)(1):

{¶ 17} "[T]he milling machine had no means within easy access of the operator for disengaging the machine from its power supply. The attempt to equate a lever which moved the moving milling parts from one place to another with a switch or other device to immediately cut off the power to the machine is an attempt to avoid the obvious. The machine simply did not comply with Ohio Adm.Code 4121:1–5–05(D)(1)." *State ex rel. Hina v. Indus. Comm.*, 10th Dist. No. 07AP–23, 2007-Ohio-4596, 2007 WL 2505261, ¶ 10.

---

1. This language is now in Ohio Adm.Code 4123:1–5–05.

{¶ 18} The court granted the writ and ordered the commission to determine whether Anchor's noncompliance proximately caused Hina's injury. Anchor and the commission now appeal to this court as of right.

{¶ 19} The interpretation of a specific safety requirement rests solely with the commission. *State ex rel. Berry v. Indus. Comm.* (1983), 4 Ohio St.3d 193, 194, 4 OBR 513, 448 N.E.2d 134. We have consistently recognized and generally deferred to the commission's expertise in areas falling under its jurisdiction. As we stated 80 years ago, "[t]he experience of [those] expert in this department of investigation, whose reports are founded upon experience touching the various hazards of industries and occupations, should be given important consideration." *State ex rel. Reaugh Constr. Co. v. Indus. Comm.* (1928), 119 Ohio St. 205, 209, 162 N.E. 800. This principle extends to VSSR matters. See *State ex rel. Taylor v. Indus. Comm.* (1994), 70 Ohio St.3d 445, 449, 639 N.E.2d 101, quoting approvingly from the court of appeals' opinion in that case (June 24, 1993), 10th Dist. No. 92AP–1203, 1993 WL 238894, referring to " 'the accumulated expertise of the commission in its construction of the safety code.' "

{¶ 20} The hearing officer determined that the spindle-starting lever was an acceptable means of disengaging the milling machine from its power supply because it "started and stopped the moving parts of the machine." The appellate court magistrate also found no substantive difference in the two methods of stopping the machine and reasoned:

{¶ 21} "[The evidence] indicates that the spindle and cutter heads slow down and stopped relatively quickly [when the spindle-starting lever is moved to the off position]. As such, the question becomes: does Ohio Adm.Code 4121:1–5–05(D)(1) require that the machine stop instantaneously when the machine is disengaged from the power supply? Common sense and experience indicate that this is not the case. Power tools which have spinning parts stop by slowing down. When turned off, the rotation does not stop instantaneously; instead, the rotating part slows down until it stops. Further, nothing in the code provision provides that the machine must instantaneously stop and the magistrate finds that to read such a requirement into the code would add a requirement which is not there. To do so would be improper. Further, relator presented no evidence that would show that, if he was able to push the power switch, the machine would have stopped rotating immediately. Therefore, relator could not show that moving the spindle lever to the off position acted any differently than the act of pushing the power switch. The reason these safety requirements are in the code is to lessen the impact of the accident on the employee. It is understood that, if an employee needs to hit the power switch to shut off the machine, the employee is already being injured. As such, a switch which disengages the machine from power acts to minimize the damage to the employee whereas a guard acts to stop

an injury from ever happening. The [staff hearing officer] relied on evidence showing that the spindle lever acted in this manner." 2007-Ohio-4596, 2007 WL 2505261, ¶ 42.

{¶ 22} The court of appeals did not find the two methods of disengaging the machine from its power supply to be equivalent, but its analysis is compromised by what appears to be a fundamental misunderstanding of the lever at issue and how the Cinova 80 worked.

{¶ 23} The court of appeals misleadingly described the relevant lever as one that "moved the moving milling parts from one place to another." Our review of the record indicates that the Cinova 80 had six levers in addition to the spindle-starting lever. One controlled spindle direction, while another controlled feed rate. The remaining four levers were power-feed levers, which controlled the direction that the table would feed, i.e., horizontally, vertically, and transversely. From our review of the operational information in the record, the only levers that appeared to control the movement of anything "from one place to another" were the power-feed levers, which are not the subject of this litigation. The spindle-starting lever that is the focus of this action disengages the spindle from its power source and activates a brake that stops rotation.

{¶ 24} The court of appeals' description of the lever, coupled with the lack of any reference to spindle disengagement or even the spindle itself, suggests that the court of appeals may have been confused about the operation of the device in question. Accordingly, we reject the opinion of the court of appeals as a basis upon which to disturb the commission's order.

{¶ 25} An award for a VSSR is a penalty against the employer, and accordingly all specific safety requirements must be strictly construed and all reasonable doubts concerning their interpretation must be construed against their applicability to the employer. *State ex rel. Burton v. Indus. Comm.* (1989), 46 Ohio St.3d 170, 172, 545 N.E.2d 1216. Under these facts, we do not find that the commission abused its discretion in finding that the spindle-starting lever was an effective means of disengaging the machine from its power supply.

{¶ 26} The judgment of the court of appeals is therefore reversed.

*Judgment reversed.*

MOYER, C.J., and LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

PFEIFER, J., dissents and would affirm the judgment of the court of appeals.

———

Larrimer & Larrimer and Thomas L. Reitz, for appellee.

Richard Cordray, Attorney General, and Kevin J. Reis, Assistant Attorney General, for appellant Industrial Commission.

Lane, Alton & Horst, L.L.C., and Joshua R. Bills, for appellant Anchor Glass Container Corporation.