[Cite as *State ex rel. Phlipot v. Doug Smith Farms*, 2024-Ohio-5820.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Ronnie H. Phlipot, | : | |
| Relator, | : | No. 23AP-158 |
| v. | : | (REGULAR CALENDAR) |
| Doug Smith Farms et al., | : | |
| Respondents. | : | |

D E C I S I O N

Rendered on 12, 2024

**On brief:** *Nager, Romaine & Schneiberg Co., LPA*, and *Catherine B. Lietzke*, for relator.

**On brief:** *Roetzel & Andress*, *Douglas E. Spiker*, and *Corey L. Kleinhenz*, for respondent Doug Smith Farms.

**On brief:** *Dave Yost*, Attorney General, and *Natalie J. Tackett*, for respondent Industrial Commission of Ohio.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

EDELSTEIN, J.

{¶ 1} Respondent, the Industrial Commission of Ohio ("commission"), denied relator Ronnie H. Phlipot's application for an additional award for a violation of a specific safety requirement ("VSSR") on the basis that respondent Doug Smith Farms complied with the requirement and, in the alternative, Mr. Phlipot's unilateral negligence was the proximate cause of his workplace injury. Mr. Phlipot now seeks a writ of mandamus from this court ordering the commission to vacate its May 3, 2022 order and grant his VSSR application. For the reasons that follow, we overrule Mr. Phlipot's objections and deny the requested writ of mandamus.

## I. Facts and Procedural History

{¶ 2} On March 11, 2020, Mr. Phlipot was seriously injured while operating a Crippen seed cleaning machine for his employer, Doug Smith Farms. It is undisputed that, while operating the machine that day, it became clogged and Mr. Phlipot proceeded to unclog the machine while it was still running. Whether he could easily have disengaged the machine's power is disputed by the parties.

{¶ 3} On the one hand, Mr. Phlipot asserts he operated the machine consistent with his training, as he had done throughout his two years of employment with Doug Smith Farms. At a hearing before a staff hearing officer ("SHO"), Mr. Phlipot testified he was instructed to unclog the machine by using a "wire-ish metal tool" that "always hung right over * * * on the side" to "scrape the fodder and the trash and stuff out of the bottom for the beans to go on and fall through." (Stip. at 263-64.) He asserted he was never trained to first shut down the machine before attempting to unclog it, and he did not believe a shut-off lever was ever affixed to the machine before his accident. (Stip. at 265, 269, 271.) In fact, he testified that the only way to shut off the machine's power was through the control panel—a much longer and inefficient process. (Stip. at 265.) Mr. Phlipot explained that on the morning of the incident, when the seed cleaner jammed, he "proceeded to clean it like [he] always [did], like [he] was told to." (Stip. at 266.) He "[o]pened the door, stuck this tool deal in there scrap[]ing the fodder and chaff and so forth out of there. And there's a turning shaft in there and it kind of has fingers on it. And it either grabbed my sleeve or my glove * * * [a]nd proceeded to wrap my arm." (Stip. at 266.)

{¶ 4} While he agreed that caution signs near the seed cleaner warned the operator to first turn off the machine before attempting to unclog it, Mr. Phlipot repeatedly and consistently testified there was no disengage switch installed to the machine at the time of his accident, he had never been trained to use one during his two years working for Doug Smith Farms, and he had never observed Mr. Smith using one. (Stip. at 265-66.) Mr. Phlipot and his father, Ronnie H. Phlipot, Sr., both testified at the hearing that Mr. Smith admitted he installed a disengage switch after the accident. (*See, e.g.*, Stip. at 264, 267-68.) Mr. Phlipot additionally recounted a trip he took to the farm shortly after the accident. According to Mr. Phlipot, Mr. Smith again admitted to installing a disengage switch and

Mr. Phlipot observed what he believed were "shiny bolts" on the machine and a switch that appeared to be "new." (Stip. at 267.)

{¶ 5}   On the other hand, Doug Smith, owner of Doug Smith Farms, asserted the machine had "all of its safety features functioning properly and in-place," including a "heavy leather-like screen which covered the tines which are designed to spin when the machine is in operation and so as to lock down the raw soybeans which are fed into it as well as a shut-off mechanism located within reach of the machine's operator." (Stip. at 122.) Additionally, he asserted Mr. Phlipot "deviated from his training in the safe operation of the machine by failing to shut it off prior to attempting to clear the blocked grain." (Stip. at 122.) Mr. Smith testified that the disconnect switch visible in photographs appended to the Ohio Bureau of Workers' Compensation ("BWC") Investigator's report "came with the machine," has "always been there," and was operational at the time of the accident. (Stip. at 273, 276-78.)  He testified that Mr. Phlipot could "easily" have reached the disconnect lever "30 inches away" if he was standing on the ground and his glove and sweatshirt were caught on the machine's third tine. (Stip. at 276.)  He also testified that he lubricated and tested the disengage switch on either February 3rd or 4th. (Stip. at 277.)

{¶ 6}   Also part of the record before the commission was the report of BWC Safety Violations Investigation Unit Investigator Fred M. Freeman, who, on April 20, 2021, conducted an on-site investigation. Mr. Freeman noted "[t]he seed cleaner was equipped with a shaft brake that stopped the rotation of the metal shaft when engaged." (Stip. at 129.)  However, he concluded neither the shaft brake nor the main control panel were "accessible from where Mr. Phlipot's arm was caught." (Stip. at 129. *See also* Stip. at 143.)

{¶ 7}   Following the hearing, on May 3, 2022, the SHO issued an order denying Mr. Phlipot's application for an additional award for VSSR.  With respect to the presence of a disengage switch, the SHO concluded as follows:

> From the testimony of Mr. Smith and the investigation report of Investigator Freeman, this Hearing Officer finds the grain cleaning machine which was installed in Mr. Smith's elevator facility in 1989 came with a mechanical disconnect/brake within reach of the operator and a hinged door guarding the operator from the rotating shaft with metal tines and that original safety components were still in place and operational at the time of injury. This Hearing Officer finds Mr. Smith persuasive in that the Injured Worker knew through training

how to stop the flow of grain by closing the hopper and how to engage the mechanical disconnect/brake to stop the shaft from turning prior to opening the access door to this part of the machine for purposes of gaining access to the rotating shaft and removing clogs from the machine.

(Stip. at 322-23.) Additionally, regarding Doug Smith Farms' claim that Mr. Phlipot was unilaterally negligent in his operation of the seed cleaner, the SHO concluded as follows:

This Hearing Officer finds the Injured Worker was unilaterally negligent by attempting to unclog the cleaning machine while it was still running. There was a process that he could have followed which included shutting off the grain supply, engaging the disconnect/brake and then opening the guard door to remove the clog. However, he bypassed this process, ignored the warning signs on the machine, opened the hinged wooden door that guarded the rotating shaft and proceeded to use a metal wire to unclog the machine, at which time, his left arm got caught in the shaft resulting in serious injury.

(Stip. at 323.)

{¶ 8} Mr. Phlipot filed a request for rehearing on June 1, 2022, which was denied by the commission on July 14, 2022. Thereafter, on March 9, 2023, Mr. Phlipot filed a complaint seeking a writ of mandamus.

{¶ 9} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a court magistrate. On July 24, 2024, the magistrate issued a decision containing findings of facts and conclusions of law, which is appended hereto. The magistrate determined that the SHO did not err in denying Mr. Phlipot's application for a VSSR award and made the following findings: (1) the Supreme Court of Ohio's decision in *State ex rel. Hina v. Indus. Comm.*, 121 Ohio St.3d 4, 2009-Ohio-250, stands for the proposition that disengaging from the "power supply," as addressed in former Ohio Adm.Code 4121:1-5-05(D)(1) means disengaging from any form of energy—whether mechanical, electrical, or otherwise; (2) the record contains some evidence supporting a finding that a mechanical disconnect switch was present, within Mr. Phlipot's reach, and was capable of disengaging the machine from its power supply; and (3) the record contains some evidence supporting a finding that Mr. Phlipot was unilaterally negligent in operating

the machine. The magistrate has recommended that this court deny Mr. Phlipot's request for a writ of mandamus.

{¶ 10} Mr. Phlipot timely filed objections to the magistrate's decision, which can be summarized as follows: (1) the magistrate erred in applying *Hina* to conclude the disconnect switch sufficiently disengaged the seed cleaner's power supply; (2) the magistrate erred in concluding that the record contains some evidence to support a finding that the disconnect switch was "within easy reach" of Mr. Phlipot, as required by Ohio Adm.Code 4123:1-5-05(D)(1); and (3) the magistrate erroneously mischaracterized the extent of Mr. Phlipot's injuries and the allowed conditions in this matter.

{¶ 11} Accordingly, we must independently review the magistrate's decision to ascertain whether "the magistrate has properly determined the factual issues and appropriately applied the law." Civ.R. 53(D)(4)(d).

## II. Legal Standards

{¶ 12} To be entitled to a writ of mandamus, Mr. Phlipot must be able to establish he has a clear legal right to the relief sought, the commission has a clear legal duty to provide such relief, and he has no adequate remedy in the ordinary course of the law. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141, 162-63 (1967).

{¶ 13} R.C. 4121.13 vests the authority to promulgate industry-specific safety standards in the BWC. *State ex rel. Jeep Corp. v. Indus. Comm.*, 42 Ohio St.3d 83, 84 (1989). "To be entitled to an additional award for a VSSR, a claimant must show that (1) a specific safety requirement applied, (2) the employer violated that requirement, and (3) the employer's violation caused the injury." *State ex rel. Precision Steel Servs. v. Indus. Comm.*, 145 Ohio St.3d 76, 2015-Ohio-4798, ¶ 15.

{¶ 14} A VSSR award is a penalty against the employer. Because it is considered a penalty for the employer's conduct, "[a] specific safety requirement must plainly apprise an employer of its legal obligation to its employees." *State ex rel. Sanor Sawmill, Inc. v. Indus. Comm.*, 101 Ohio St.3d 199, 2004-Ohio-718, ¶ 25. Furthermore, "a safety standard 'must be strictly construed, and all reasonable doubts concerning the interpretation of the safety standard are to be construed against its applicability to the employer.' " *State ex rel. Strawser v. Indus. Comm.*, 10th Dist. No. 22AP-330, 2023-Ohio-4327, ¶ 18, quoting *State ex rel. Cassens Corp. v. Indus. Comm.*, 10th Dist. No. 21AP-93, 2022-Ohio-2936, ¶ 7.

However, "the application of the strict-construction rule cannot justify an illogical result or one that is contrary to the clear intention of the code." *State ex rel. Pennant Moldings*, *Inc. v. Indus. Comm.*, 10th Dist. No. 11AP-942, 2013-Ohio-3259, ¶ 16, citing *State ex rel. Maghie & Savage, Inc. v. Nobel*, 81 Ohio St.3d 328, 331 (1998).

{¶ 15} Mr. Phlipot's application for an additional VSSR award alleged a violation of Ohio Adm.Code 4123:1-5-05(D)(1), which mandates that auxiliary equipment in workshops and factories be equipped with a mechanism for disengaging the machine's power supply. In relevant part, it states, "Means will be provided at each machine, within easy reach of the operator, for disengaging it from its power supply." Ohio Adm.Code 4123:1-5-05(D)(1).

{¶ 16} In its defense, Doug Smith Farms asserts: (1) the seed cleaner was equipped with such means; and (2) even if they failed to comply with the specific safety requirement, Mr. Phlipot's unilateral negligence in operating the machine was the proximate cause of his workplace injury.

{¶ 17} Unilateral negligence is "a defense to VSSR liability that has been described as applying 'only where the claimant *deliberately* renders an otherwise complying device noncompliant.' " (Emphasis sic.) *State ex rel. Quality Tower Serv., Inc. v. Indus. Comm.*, 88 Ohio St.3d 190, 192 (2000), quoting *State ex rel. R.E.H. Co. v. Indus. Comm.*, 79 Ohio St.3d 352, 355 (1997). " '[T]he defense is not actually about an employee's *negligence*. The employer instead avoids VSSR liability when "[t]he employee unilaterally *violates* a safety requirement." ' " (Emphasis sic.) *State ex rel. Byington Builders, Ltd. v. Indus. Comm.*, 156 Ohio St.3d 35, 2018-Ohio-5086, ¶ 40, quoting, *Quality Tower Serv., Inc.* at 193. *See also State ex rel. Glunt v. Indus. Comm.*, 132 Ohio St.3d 78, 2012-Ohio-2125, ¶ 16.

## III. Analysis

### A. Mr. Phlipot's First Objection

{¶ 18} In what appears to be his first objection to the magistrate's decision, Mr. Phlipot contends the commission and the magistrate erred in finding *Hina* applies to the facts of this case. Specifically, Mr. Phlipot asserts *Hina* requires some evidence to prove a disengage mechanism fully cut off the machine's mechanical power. (Objs. at 1-2.) Specifically, Mr. Phlipot claims:

> Even following [*Hina*], which held that a brake is the same as
> a means to disengage from the power supply, the Crippen seed
> cleaner lever/disconnect/brake did not stop the pully! (JSR

277, pg. 68 lines 21-22). Respondent in his testimony admits that this lever/disconnect/brake did not stop the pulley. 'It is still turning'. (JSR 277 pg 68 line 21-22). This is very different than the Hina case. This lever/disconnect/brake did not stop the mechanical power as the brake did in Hina.

(Sic passim.) (Objs. at 1-2.)

{¶ 19} During the hearing, the SHO asked Mr. Smith whether the seed cleaner's disengage switch functioned to "remove the power supply." (Stip. at 277.) The two engaged in the following dialogue:

THE HEARING OFFICER: One last question for you, Mr. Smith, hopefully. You're very technical that's why you're getting asked a lot of questions. The shut off that you're talking about, does it shut that agitating shaft off through disconnecting power –

* * *

-- or does it disconnect the pulley or there's a slip clutch or something?

MR. SMITH: I'm going to show it to you. It goes around and it catches like that. (Indicating.) And all you do is pop that lever over. And I tested that machine February 3rd or 4th cause I was there for two or three days switching it from wheat to beans. And I tested it and it worked.

THE HEARING OFFICER: Does it remove the power supply?

MR. SMITH: No, it's on the back. The pulley is still turning but the shaft stopes. It pulls that thing away from. (Indicating.)

(Stip. at 277.)

{¶ 20} Relying on Mr. Smith's hearing testimony, the SHO concluded the disengage switch functioned to "stop the shaft from turning" and was operational at the time of the accident. (Stip. at 318.) In addition to Mr. Smith's testimony, the BWC Investigator's report provides further evidence that the disengage switch "stopped the rotation of the metal shaft when engaged." (Stip. at 129.) Based on this evidence, the magistrate stated: "[T]he pulley that caused the shaft to rotate was the power source, and the 'means' to disengage the pulley from the shaft was the disconnect switch, which mechanically stopped

the rotating shaft by engaging a clutch that separated the pulley from the shaft, thereby stopping the moving parts. Although both the machines in *Hina* and the present case had a shutoff switch and a main power panel, respectively, that cutoff the electrical power supply to the entire machine, they were equivalent to the mechanical methods of disengaging the machines from their power supplies, in that all four methods stopped the moving parts that posed a danger to the operator." (Mag.'s Decision at 19.)

{¶ 21} While perhaps Mr. Smith's hearing testimony regarding the shaft and the pulley could have been clearer, we find the SHO's conclusion that the disengage switch "disengag[ed] the seed cleaner from the power supply" is supported by some evidence in the record. Ohio Adm.Code 4123:1-5-05(D)(1). We therefore overrule Mr. Phlipot's first objection.

### B. Mr. Phlipot's Second Objection

{¶ 22} In his second objection, Mr. Phlipot asserts the magistrate erred in concluding the record contains some evidence demonstrating the disengage switch would have been "within easy reach" from where Mr. Phlipot was located at the time of the accident. *See* Ohio Adm.Code 4123:1-5-05(D)(1). In his objections, Mr. Phlipot notes the BWC Investigator concluded the disengage switch would not have been within Mr. Phlipot's reach during the accident, concedes that Mr. Smith repeatedly testified otherwise during the hearing, and cites *State ex rel. Jackson Tube Serv., Inc. v. Indus. Comm.*, 154 Ohio St.3d 180, 2018-Ohio-3892, as support for his argument that Mr. Smith's testimony was not "some evidence" supporting the commission's order.

{¶ 23} In *Jackson Tube* an injured worker filed an application for a VSSR award concerning operation of hoisting and haulage equipment, and the respondent-employer raised the defense of impossibility. At a hearing on the VSSR application, the injured worker testified that it was his "*understanding* that there is a fixture for that application that's offered by the manufacturer." (Emphasis sic.) *Jackson Tube* at ¶ 4. The employer's maintenance supervisor and manager of safety and training both testified they were not aware of such a fixture that would satisfy the specific safety requirement at issue. After the SHO granted the injured worker's VSSR application, the employer filed a motion for rehearing and appended an affidavit from its maintenance supervisor, which indicated that

he researched the issue, spoke with the tool manufacturer's engineer, and verified there was no alternative tool that would allow for compliance. *Id.* at ¶ 4, 6.

{¶ 24} The commission denied the motion for rehearing, concluding the SHO's decision was supported by some evidence—namely, the injured worker's testimony. After we denied a writ of mandamus, the employer sought review from the Supreme Court of Ohio, arguing there was no alternative method for undertaking the work and the injured worker's " 'understanding' about the existence" of such a method "ha[d] no basis in fact and ha[d] been wholly refuted by contrary testimony." *Id.* at ¶ 12. A majority of the court agreed, reversed our decision, and found the commission abused its discretion in relying on the injured worker's "unsubstantiated belief, unsupported by personal knowledge" as some evidence. *Id.* at ¶ 28, citing *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 223 (1994) ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter."). Thus, based on the facts and circumstances of that case, the court concluded the injured worker's "unsubstantiated belief" that was not based on his own personal knowledge could not constitute some evidence supporting the commission's order.

{¶ 25} Mr. Phlipot contends Mr. Smith's testimony that the disengage switch would have been within Mr. Phlipot's reach during the accident is as problematic as the injured worker's testimony in *Jackson Tube*. He asserts Mr. Smith's testimony was merely an unsubstantiated belief lacking personal knowledge or expertise. We disagree.

{¶ 26} First, we do not believe this type of testimony requires expert analysis. Mr. Smith would have had personal knowledge of Mr. Phlipot's size and the approximate distance between Mr. Phlipot and the disengage switch, having observed him working in the facility on prior occasions. As such, unlike in *Jackson Tube*, where the testimony concerned a subject about which the injured worker did not have personal knowledge, and that was rebutted by evidence from the tool manufacturer's own engineer, Mr. Smith's testimony was not merely an "unsubstantiated belief." Therefore, we conclude Mr. Smith's testimony constituted some evidence in support of the commission's order.

{¶ 27} However, even if that testimony was insufficient to constitute some evidence, we find additional evidence in the record to support the commission's order. The SHO reviewed the photographs in the record and observed Mr. Phlipot during the hearing, and

was able to come to his own conclusion about the ease with which Mr. Phlipot would have been able to reach the disengage switch. While this court acknowledges the BWC Investigator came to a different conclusion, and we might disagree with the SHO's weighing of the evidence in the record, that does not diminish the fact that some evidence supports the commission's order. *See, e.g., State ex rel. Culver v. Indus. Comm.*, 10th Dist. No. 22AP-292, 2024-Ohio-1138, ¶ 42, citing *State ex rel. West v. Indus. Comm.*, 74 Ohio St.3d 354, 356 (1996) ("Where the commission's decision is supported by some evidence, the presence of contrary evidence in the record is immaterial."). We therefore overrule Mr. Phlipot's second objection.

### C. Mr. Phlipot's Third Objection

{¶ 28} In Mr. Phlipot's third and final objection to the magistrate's decision, he asserts "there is more value in this claim than what is listed by the Magistrate." (Objs. at 3.) While we recognize the magistrate failed to note the extent of the allowed conditions and the serious injuries Mr. Phlipot sustained from his workplace accident, Mr. Phlipot does not explain how that abbreviated description had any bearing on the magistrate's ultimate findings of fact and conclusions of law relative to the VSSR application, nor can we see any. As such, we overrule Mr. Phlipot's third objection.

## IV. Disposition

{¶ 29} Following our examination of the magistrate's decision and our independent review of the record pursuant to Civ.R. 53, we find the magistrate properly applied the relevant law to the salient facts in reaching the conclusion that Mr. Phlipot is not entitled to a writ of mandamus. Therefore, we overrule Mr. Phlipot's objections and adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we deny Mr. Phlipot's request for a writ of mandamus.

*Objections overruled;*
*writ of mandamus denied.*

MENTEL, P.J. and DORRIAN, J., concur.

APPENDIX

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel. Ronnie H. Phlipot,          :

        Relator,          :

v.          :          No. 23AP-158

                  :

Doug Smith Farms et al.,          :          (REGULAR CALENDAR)

                  :

        Respondents.          :

                  :

---

M A G I S T R A T E ' S   D E C I S I O N

Rendered on July 25, 2024

---

*Nager*, *Romaine & Schneiberg Co.*, *LPA*, and *Catherine B. Lietzke*, for relator.

*Roetzel & Andress*, *Douglas Spiker*, *Jonathan D. Miller*, and *Lauren M. Smith*, for respondent Doug Smith Farms.

*Dave Yost*, Attorney General, and *Natalie J. Tackett*, for respondent Industrial Commission of Ohio.

---

IN MANDAMUS

{¶ 30} Relator, Ronnie H. Phlipot ("claimant"), has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission"), to vacate its order that found Doug Smith Farms ("employer") did not violate a specific safety requirement ("VSSR").

<u>Findings of Fact</u>:

{¶ 31} 1. According to the record, it is undisputed that claimant was in the employer's barn cleaning seed in the machine, which has an agitator with a rotating shaft

and tines inside of a hopper box, when it jammed. Claimant, who was alone in the barn, loosened wing nuts and lowered a wooden door on the hopper box to gain access to the clogged shaft. While the shaft and tines were still rotating, claimant used a wire device provided and fabricated by the employer to clear the seed from machine. The machine grabbed the wire device and pulled claimant's glove or sleeve and then arm into the agitator. Claimant's arm was partially severed in the machine. He was able to walk to his car and use his cell phone to call 911.

{¶ 32} 2. The main power panel for the machine was not located near where claimant was injured. It was located down steps, around hoppers, and several more feet away. The machine had a shaft with tines that rotated via a pulley. The machine had a disconnect switch located on the front of the machine in the location where claimant's injury occurred that would mechanically stop the rotating shaft and tines by engaging a clutch, which moved the pulley away from the rotating shaft but did not disengage the electrical power supply. However, there was conflicting testimony as to whether the disconnect switch was present on the machine at the time of the accident or whether it was added after the injury. The machine also had a caution sign above the disconnect switch that warned users not to operate the machine without guards.

{¶ 33} 3. Claimant testified that, after the accident, Doug Smith, the owner of employer, came to visit him at his father's house and told claimant that he had added a disconnect switch to the machine in case somebody came to investigate, and he parked his vehicle inside the barn so no one would see him. Claimant's dad gave the same account at the hearing. Claimant testified that when he returned to the barn after being released from the hospital, he saw a disconnect switch on the machine with shiny bolts that Smith had added to it after the injury. Claimant testified that, prior to the injury, there was just an empty hole in the machine at the location of the disconnect switch. Claimant testified that Smith was present when he returned to the barn, and Smith pointed out the new disconnect switch he had added to the machine. Claimant also testified that he was never trained to shutdown the machine before clearing the agitator. Claimant testified that Smith instructed him to use the wire device to clear the agitator, Smith used the wire device for the same purpose, and Smith had seen claimant use the wire device before without warning him of any dangers. Claimant did not believe he was standing on anything when he reached into the machine but expressed some uncertainty.

{¶ 34} 4. Smith testified that he added a horseshoe-shaped part and bolt to the machine around February 3, 2020, to make sure that the disconnect switch could not be bumped and accidentally put the machine into gear, but he did not alter the machine after the injury. Smith also testified that he taught claimant to first close the rolled door on the hopper box and then engage the disconnect switch before clearing any clogs. Smith told the Bureau of Workers Compensation ("BWC") investigator that all guards were on the machine and were operating correctly at the time of the injury, and he did not make any repairs to the machine after the incident. The BWC investigator did not note any new alterations to the machine. Smith testified that the shaft disconnect switch came with the machine and was always on the machine since it was installed in 1989. Smith testified that he had before felt the machine tug or pull when unjamming the machine, and it had grabbed his sleeve but he was able to remove his arm. Smith stated that he found claimant's glove on the third tine on the shaft, and claimant could have easily reached the disconnect switch from that distance. Smith believed claimant was standing on a bucket when he reached into the machine. Smith responded to a BWC investigation information request form asking for copies of the prior six months of maintenance records for the machine by stating that the machine was self maintained but did not provide any records.

{¶ 35} 5. Claimant's claim was allowed for left traumatic above elbow amputation.

{¶ 36} 6. On February 2, 2021, claimant filed an application for VSSR. Although he originally claimed violations of numerous code sections in the application, claimant eventually dismissed all code sections except Ohio Adm.Code 4123:1-5-05(D)(1).

{¶ 37} 7. Ohio Adm.Code 4123:1-5-05(D)(1) provides:

> (D) Machinery control.
>
> (1) Disengaging from power supply.
>
> Means will be provided at each machine, within easy reach of the operator, for disengaging it from its power supply. This does not apply to rolling departments of iron and steel mills nor to electrical power generation or conversion equipment.

{¶ 38} 8. On April 6, 2022, a hearing was held before a staff hearing officer ("SHO"). On May 3, 2022, the SHO issued an order that denied the VSSR application and found the following: (1) the machine came with a disconnect switch within reach of the operator and a hinged door guarding the operator from the rotating shaft with metal tines, and the

original safety components were still in place and operational at the time of the injury; (2) Smith's testimony was persuasive that claimant knew through training how to stop the flow of grain by closing the hopper and how to engage the mechanical disconnect switch to stop the shaft from turning prior to opening the access door; (3) pursuant to *State ex rel. Frank Brown & Sons, Inc. v. Indus. Comm.*, 37 Ohio St.3d 162 (1988), an employer avoids VSSR liability when the employee unilaterally violates a safety requirement; that is, removes or ignores equipment or instruction that complies with a specific safety requirement; (4) claimant was unilaterally negligent by attempting to unclog the machine while it was still running; (5) there was a process claimant could have followed that included shutting off the grain supply, engaging the disconnect switch, and then opening the guard door to remove the clog; (6) claimant bypassed this process, ignored the warning signs on the machine, opened the hinged wooden door that guarded the rotating shaft, and proceeded to use a metal wire to unclog the machine, at which time his left arm got caught in the shaft, resulting in serious injury; and (7) based upon these findings, the employer did not violate Ohio Adm.Code 4123:1-5-05(D)(1), and the direct and proximate cause of injury was due to claimant's unilateral negligence.

{¶ 39} 9. Claimant filed a request for rehearing, which the commission denied on July 14, 2022.

{¶ 40} 10. On March 9, 2023, claimant filed a complaint for writ of mandamus.

Conclusions of Law and Discussion:

{¶ 41} The magistrate recommends that this court deny claimant's petition for writ of mandamus.

{¶ 42} In order for this court to issue a writ of mandamus, a relator must establish the following three requirements: (1) that relator has a clear legal right to the relief sought; (2) that respondent has a clear legal duty to provide such relief; and (3) that relator has no adequate remedy in the ordinary course of the law. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967).

{¶ 43} To establish a VSSR, a claimant must prove that: (1) there exists an applicable and specific safety requirement in effect at the time of the injury; (2) the employer failed to comply with the requirements; and (3) the failure to comply was the proximate cause of the injury in question. *State ex rel. Trydle v. Indus. Comm.*, 32 Ohio St.2d 257 (1972).

{¶ 44} The interpretation of a specific safety requirement is within the final jurisdiction of the commission. *State ex rel. Berry v. Indus. Comm.*, 4 Ohio St.3d 193 (1983). However, because a VSSR is a penalty, it must be strictly construed, and all reasonable doubts concerning the interpretation of the safety standard are to be construed against its applicability to the employer. *State ex rel. Burton v. Indus. Comm.*, 46 Ohio St.3d 170 (1989). The question of whether an injury was caused by an employer's failure to satisfy a specific safety requirement is a question of fact to be decided by the commission subject only to the abuse of discretion test. *Trydle*; *State ex rel. A-F Industries, ACME-FAB Div. v. Indus. Comm.*, 26 Ohio St.3d 136 (1986). When the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. *State ex rel. Lewis v. Diamond Foundry Co.*, 29 Ohio St.3d 56, 58 (1987). Furthermore, a safety requirement must be specific enough to plainly apprise an employer of its legal obligations to its employees. *Frank Brown & Sons, Inc.*, 37 Ohio St.3d 162.

{¶ 45} The defense of unilateral negligence by an employee is available to an employer in a VSSR case only if the employer has complied with the specific safety requirement, and the employee has unilaterally violated it. *State ex rel. Byington Builders, Ltd. v. Indus. Comm.*, 156 Ohio St.3d 35, 2018-Ohio-5086, ¶ 39-40. "Because the critical issue in a VSSR claim is always whether the employer complied with the [specific safety requirement], an employee's conduct, even if negligent, is not relevant to a VSSR determination unless the injury is caused by the claimant's deliberate circumvention or disabling of a safety device or refusal to use employer-provided safety equipment." *State ex rel. Sunesis Constr. Co. v. Indus. Comm.*, 152 Ohio St.3d 297, 2018-Ohio-3, ¶ 29 (citations omitted). The unilateral negligence defense is viable when an employee "removes or ignores equipment or instruction that complies with a specific safety requirement." *State ex rel. Quality Tower Serv., Inc. v. Indus. Comm.*, 88 Ohio St.3d 190, 193 (2000). It must be kept in mind that specific safety requirements are intended to protect employees from their own negligence, folly, and stupidity, in addition to providing them with a safe working environment. *State ex rel. Blystone v. Indus. Comm.*, 14 Ohio App.3d 238 (10th Dist.1984).

{¶ 46} In the present matter, claimant first asserts that the commission abused its discretion because there was not some evidence to support the denial of the VSSR application, as the employer did not have a means within easy reach of the operator for

disengaging the machine from its "power supply," as required by Ohio Adm.Code 4123:1-5-05(D)(1). Claimant argues that, although Smith claimed there was a disconnect switch that would stop the shaft from rotating in the hopper box, Smith admitted that the switch did not disengage the electrical power supply. The main power panel was located far away from the operator's location—down steps, around hoppers, and then several more feet away. Claimant also contends that Smith admitted he added a horseshoe-shaped plate with a bolt around February 3, 2020, to prevent the disconnect switch from getting bumped and putting the shaft into gear, and the dispute here is when Smith added the horseshoe-shaped plate and bolt. Claimant asserts that Smith's claim conflicts with the fact that he did not provide the BWC investigator with any maintenance records completed in the six months prior to the injury.

{¶ 47} Initially, although claimant spends a significant amount of time arguing about when the horseshoe-shaped plate and bolt were added to the machine to cover the disconnect switch, the magistrate finds this issue irrelevant for purposes of determining whether a VSSR violation occurred. Claimant frames his argument regarding the horseshoe-shaped plate as one of credibility; i.e., Smith never mentioned adding the horseshoe-shaped plate until the hearing, so his testimony that the disconnect switch was on the machine at the time of the injury cannot be believed. However, notwithstanding that this argument raises an issue of credibility that is best left to the commission to adjudge, it simply does not help answer the critical question of whether the disconnect switch disengaged the machine from its "power supply," as required by Ohio Adm.Code 4123:1-5-05(D)(1).

{¶ 48} With regard to this issue and the actual VSSR violation, the SHO concluded that the machine came with a disconnect switch within reach of the operator and a hinged door guarding the operator from the rotating shaft with metal tines, and the original safety components were still in place and operational at the time of the injury. Claimant argues that the disconnect switch did not disengage the machine from its "power supply" because it did not cutoff electricity from the machine but instead only stopped the shaft from rotating in the hopper box. Claimant claims that because the main electrical power panel was clearly not within easy reach of the operator, as it was indisputably located far away from the point of operation, the machine did not comply with Ohio Adm.Code 4123:1-5-

05(D)(1), and the employer violated a specific safety requirement. In essence, claimant's argument is that "power supply" means electrical power and not mechanical power.

{¶ 49} The Supreme Court of Ohio addressed a very similar argument in *State ex rel. Hina v. Indus. Comm. of Ohio*, 121 Ohio St.3d 4, 2009-Ohio-250. In *Hina*, the worker was injured when he was pulled into a milling machine. The machine had cutter heads that attached to a rotating spindle, and the operator would start and stop the spindle by means of a lever. The spindle-starting lever acted like a clutch bringing the manual clutch out of gear, and when the spindle-starting lever was moved to the off position, a brake stopped all moving units. The machine also had a shutoff switch that stopped electrical power to the entire machine. There was no evidence that moving the spindle-starting lever to the off position stopped the cutter heads instantaneously or any evidence that the shutoff switch did either.

{¶ 50} Compensation was allowed, and the worker applied for an additional VSSR award, claiming that the employer had violated former Ohio Adm.Code 4121:1-5-05(D)(1), which included language identical to Ohio Adm.Code 4123:1-5-05(D)(1). An SHO found no violation, determining that the spindle-starting lever qualified as an acceptable means of disengaging the machine from its power supply under Ohio Adm.Code 4121:1-5-05(D)(1) because it started and stopped the moving parts of the machine. Upon mandamus, a magistrate of this court found no substantive difference between stopping the machine utilizing the shutoff switch or the spindle-starting lever, reasoning that the spindle and cutter heads slow down and stopped relatively quickly when the spindle-starting lever was moved to the off position, and Ohio Adm.Code 4121:1-5-05(D)(1) does not require that the machine stop instantaneously when the machine is disengaged from the power supply. The magistrate also found there was no evidence that showed the shutoff switch stopped the machine from rotating immediately. Therefore, explained the magistrate, the worker could not show that moving the spindle-starting lever to the off position acted any differently than the act of pushing the power shutoff switch, and the evidence showed that the spindle-starting lever and the power shutoff switch both acted to minimize the damage to the employee.

{¶ 51} Upon objections, the court found a violation of former Ohio Adm.Code 4121:1-5-05(D)(1), finding:

> The evidence before the commission clearly establishes that the milling machine had no means within easy access of the

> operator for disengaging the machine from its power supply. The attempt to equate a lever which moved the moving milling parts from one place to another with a switch or other device to immediately cut off the power to the machine is an attempt to avoid the obvious. The machine simply did not comply with Ohio Adm.Code 4121:1-5-05(D)(1).
>
> Relator had his arm drawn into the milling machine. He could not hit a cut-off switch because there was no cut-off switch accessible. The VSSR was clearly established unless the honorable court engages in a tortuous interpretation of what a power supply is. We are not willing to do so.

*State ex rel. Hina v. Indus. Comm.*, 10th Dist. No. 07AP-23, 2007-Ohio-4596, ¶ 10-11.

{¶ 52} On appeal to the Supreme Court of Ohio, the court found that, although the court of appeals did not find the two methods of disengaging the machine from its power supply to be equivalent, its analysis was compromised by what appears to be a fundamental misunderstanding of the lever at issue and how the machine worked. The court explained that the court of appeals misleadingly described the relevant lever as one that moved the moving milling parts from one place to another, but the only levers that appeared to control the movement of anything from one place to another were the power-feed levers, which were not the subject of the litigation. Instead, the spindle-starting lever was the focus of the action and disengaged the spindle from its power source and activated a brake that stopped rotation. The court found that the court of appeals' description of the lever, coupled with the lack of any reference to spindle disengagement or even the spindle itself, suggests that the court of appeals may have been confused about the operation of the machine. The court concluded that the commission did not abuse its discretion when it found that the spindle-starting lever was an effective means of disengaging the machine from its power supply.

{¶ 53} It is clear from the Supreme Court's decision in *Hina* that the court did not believe that disengaging from the "power supply," as used in former Ohio Adm.Code 4121:1-5-05(D)(1), necessarily meant disengaging from an electrical power supply. Instead, the court believed that the "power supply" could be any source or means of supplying energy, be it mechanical, electric, or other. This is apparent in the following sentence from *Hina*: "The spindle-starting lever that is the focus of this action disengages the spindle from its power source." *Hina*, 2009-Ohio-250, at ¶ 23. In *Hina*, the gears that caused the spindle to rotate were the power source, and the "means" to disengage the gears from the spindle was the spindle-starting lever, which acted like a clutch to bring the manual clutch out of gear

and stop all moving parts when it was moved to the off position. Similarly, in the present case, the pulley that caused the shaft to rotate was the power source, and the "means" to disengage the pulley from the shaft was the disconnect switch, which mechanically stopped the rotating shaft by engaging a clutch that separated the pulley from the shaft, thereby stopping the moving parts. Although both the machines in *Hina* and the present case had a shutoff switch and a main power panel, respectively, that cutoff the electrical power supply to the entire machine, they were equivalent to the mechanical methods of disengaging the machines from their power supplies, in that all four methods stopped the moving parts that posed a danger to the operator. Therefore, based upon the analysis in *Hina*, the mechanical disconnect switch in the present case disengaged the machine from its power supply, and the disconnect switch was within easy reach of claimant, consistent with the specific safety requirements in R.C. 4123:1-5-05(D)(1). The commission did not abuse its discretion when it found there was no VSSR, and there was some evidence to support the commission's determination.

{¶ 54} Claimant next argues that the SHO abused his discretion when he did not follow the law in *State ex rel. U.S. Tubular Prods., Inc. v. Indus. Comm.*, 165 Ohio St.3d 85, 2021-Ohio-1174, in which the court held that unilateral negligence can only be found when the employer has done what it was required to do, and, here, like in *Tubular Products*, the power supply could not be disengaged by the operator. Furthermore, claimant asserts, no negligence can be attributed to claimant's actions because he did exactly as Smith had told him and showed him to do, he was never given any training materials, and he was never reprimanded in the past for doing the exact same actions. Also, claimant contends, it is apparent that Smith too cleared jams with the shaft running, given his testimony that his sleeve had been caught before in the machine. Claimant also contends that, even if claimant unscrewed the hopper box to unjam the machine, the SHO's claim that this constituted removal of "guarding" and unilateral negligence is irrelevant, given the employer did not comply with the code.

{¶ 55} Although the magistrate believes the application of the Supreme Court of Ohio's decision in *Hina* resolves the present case, and *U.S. Tubular* does not apply because the power supply here could be disengaged by the operator by use of the mechanical disconnect switch, the magistrate finds the other arguments posed by claimant along with his *U.S. Tubular* argument are without merit. Contrary to claimant's claim that no

negligence can be attributed to him because he operated the machine as he was told, Smith testified that he taught claimant to first close the rolled door on the hopper box and then engage the disconnect switch before clearing any clogs. Smith told the BWC investigator that all guards were on the machine and were operating correctly at the time of the injury, and he did not make any repairs to the machine after the incident. Smith also testified that the shaft disconnect switch came with the machine and was always on the machine since it was installed in 1989, and the BWC investigator did not note any new alterations to the machine. Smith further stated that claimant could have easily reached the disconnect switch from the point he was operating the machine. The commission believed Smith's testimony to be credible, which is within its discretion to do. Despite Smith's instruction and the warnings on the machine, claimant opened the hopper box, reached into the machine with a metal wire to unclog it while the shaft and tines were still rotating. For these reasons, the commission had some evidence to find claimant was unilaterally negligent.

{¶ 56} Accordingly, it is the magistrate's recommendation that this court deny the claimant's petition for writ of mandamus.

/S/ MAGISTRATE
THOMAS W. SCHOLL III

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b). A party may file written objections to the magistrate's decision within fourteen days of the filing of the decision.